UNITED STATES of America,
Plaintiff-Appellee,

v.

ONE (1) 1966 BEECHCRAFT BARON,
NO. N242BS, Defendant-Appellant.

No. 85–5145.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 11, 1985.

Decided April 17, 1986.

Roger Thompson, Robert L. Cheek and Associates, James L. Jones, Brandt W. Davis (argued), Knoxville, Tenn., for defendant-appellant.

Joe B. Brown, U.S. Atty., Nashville, Tenn., Ross E. Alderman, John Williams (argued), for plaintiff-appellee.

Before ENGEL and KRUPANSKY, Circuit Judges and SUHRHEINRICH, District Judge.*

KRUPANSKY, Circuit Judge.

Expo-Leasing, Inc. (Expo Inc.) and Albert Gillette Rogers (Rogers), the owners of a 1966 Beechcraft Baron, appealed from an order directing forfeiture of the defendant aircraft to the United States pursuant to 19 U.S.C. § 1703.

At approximately 8:00 p.m. on December 18, 1983, airport radar on Grand Bahama Island detected an unidentified aircraft at

---

* Hon. Richard F. Suhrheinrich, United States District Judge, Eastern District of Michigan, sitting by designation.

8,000 feet over the westerly section of the island flying on a westerly heading toward the Florida coastline. Although its point or time of departure was not known, it apparently had flown from a location south of Nassau. Various official inquiries disclosed that the aircraft had filed no flight plan, had failed to report its approach into the United States Air Defense Identification Zone, and had failed to notify the United States Customs Service of its intended entry into the United States.

The aircraft was immediately thereafter intercepted by United States Customs pilot William Perry who was assigned to night flight patrol over the area in a twin jet Cessna Citation. His aircraft was equipped with an infrared and radar scopes.

At approximately the time of the intercept, the unidentified aircraft began a descent to an altitude of 100 feet at which altitude effective coastal radar detection is foreclosed. Perry identified the aircraft as a twin-engined Beechcraft Baron that was operating without navigational lights. The Beechcraft's modus operandi within an airspace and air corridor exploited by drug smugglers to penetrate the territorial integrity of the United States prompted Perry to initiate surveillance of the unidentified craft which matched, in all respects, the profile of a drug smuggler that had been developed by the Bureau of Customs to interdict the drug trade into the United States from major drug distribution centers in the Caribbean Islands and other areas of the Western Hemisphere. Perry radioed Miami customs headquarters for the assistance of a second Cessna Citation as he tracked the Beechcraft inland from Vero Beach, Florida, at which point it had clandestinely entered the territorial airspace of the United States.

In the general area of Daytona Beach, Florida, Perry was joined by a second customs' Cessna Citation, at which time the

two aircrafts executed a positive hand-off before Perry broke-off his surveillance to refuel at a Daytona Beach airport.[1]

Perry recepted the Beechcraft Baron in the area of Atlanta, Georgia and the two customs aircraft tracked it to the area of the Sparta White County Tennessee airport (Sparta) where it disappeared into a heavy cloud formation and was lost at approximately 2:00 a.m. After a search of the immediate air space, Perry landed at Sparta at about 2:45 a.m. The second customs craft returned to its base in Florida. After landing at Sparta and when it became apparent that the missing aircraft was not in the general geographical area, an all points bulletin was issued to local law enforcement agencies to assist in its location.

At 3:30 a.m. on the morning of December 19, 1983, a Beechcraft Baron was located by the Cumberland County Sheriff's Department at Cumberland County's Rockwood Airport which had been closed to all aircraft after nightfall of December 18, 1983. The aircraft had been abandoned on the center of the runway with a flat tire. It was locked and the tarmac under and around the craft reeked of gasoline that appeared to have been recently dumped in the area. After a search warrant had been executed on the Beechcraft, a search and inspection of the Beechcraft disclosed that it was equipped with a Loran C navigation unit, generally suitable for long over water and overland flight and with a capability of instantly fixing a position on an aeronautical chart, a color radar indicator and two sophisticated radios. The co-pilots' seat had been removed and the space was configured to accommodate a quick connect portable bladder type auxiliary fuel system designed to substantially increase the normal 4 to 4½ flying hours of a Beechcraft

---

1. A "hand-off" is an aerial maneuver designed to ensure a positive and continuous surveillance of an in-flight aircraft. A second aircraft will join the surveilling aircraft in tight formation flight until the assisting aircraft, with the direction and co-ordination of ground control radar and

radar control from the surveilling aircraft, vector the common identical target (lock-in the target). When the maneuver has been completed, the surveilling aircraft craft "breaks-off" and the assisting craft continues the track.

Baron aircraft thereby considerably extending its range of flight.[2]

At approximately 6:30 a.m. on December 19, 1983, Rogers, a reputed drug smuggler, was arrested by the Morgan County Tennessee Sheriff's Department in possession of a motor vehicle that had been stolen from the Rockwood Airport between 3:00 and 4:15 a.m. that morning. The ignition keys to the abandoned Beechcraft Baron and $1,900.00 in cash were found on his person.

On September 6, 1984, the United States filed a Complaint for forfeiture of the aircraft pursuant to 19 U.S.C. § 1703. After trial on the merits, the district court entered an order of forfeiture. This timely appeal followed.

▆▆ On appeal, appellants complained that the government did not meet its burden of demonstrating probable cause to institute the forfeiture action. In a forfeiture action, the government bears the initial burden of demonstrating probable cause to support a forfeiture. If the government succeeds in proving probable cause, the burden shifts to the claimant to prove, by a preponderance of the evidence, that the property was not subject to forfeiture. *United States v. $22,287 United States Currency*, 709 F.2d 442, 446 (6th Cir.1983).

▆▆ To establish probable cause to support an action of forfeiture the government must demonstrate "a reasonable ground for belief of guilt, supported by less than prima facie proof, but more than mere suspicion." *$22,287* at 446–47 *quoting United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980). In addition to this probable cause showing, the government must also prove a nexus between the property to be forfeited and the criminal activity defined by the statute. *$22,287* at 447.

The defendant aircraft was forfeited pursuant to 19 U.S.C. § 1703 which states in relevant part:

(a) Whenever any vessel which shall have been built, purchased, fitted out in whole or in part, or held, in the United States or elsewhere, for the purpose of being employed to defraud the revenue or to smuggle any merchandise into the United States, or to smuggle any merchandise into the territory of any foreign government in violation of the laws there in force, if under the laws of such foreign government any penalty or forfeiture is provided for violation of the laws of the United States respecting the customs revenue, or whenever any vessel which shall be found, or discovered to have been employed, or attempted to be employed, within the United States for any such purpose, or in anywise in assistance thereof, or whenever any vessel of the United States which shall be found, or discovered to have been, employed, or attempted to be employed at any place, for any such purpose, or in anywise in assistance thereof, if not subsequently forfeited to the United States or to a foreign government, is found at any place at which any such vessel may be examined by an officer of the customs in the enforcement of any law respecting the revenue, the said vessel and its cargo shall be seized and forfeited.

\* \* \* \* \* \*

(c) For the purposes of this section, the fact that a vessel has become subject to pursuit as provided in section 1581 of this title, or is a hovering vessel, or that a vessel fails, at any place within the customs waters of the United States or within a customs-enforcement area, to display lights as required by law, shall be prima facie evidence that such vessel is being, or has been, or is attempted to be employed to defraud the revenue of the United States.

Subsection (a) of the statute provides that an aircraft shall be forfeited if two conditions are satisfied. First, the aircraft must be found at a place where customs officials

---

**2.** The auxiliary rubber bladder fuel system installed in the Beechcraft had not been approved or certified by the FAA.

may examine the craft. Second, the aircraft must have been either fitted out in whole or part "for the purpose of being employed to defraud the revenue or to smuggle any merchandise into the United States," or employed or attempted to be employed for that purpose. Subsection (c) provides that an aircraft's failure to display navigation lights as required by law constitutes "prima facie evidence that such vessel is being, or has been, or is attempted to be employed to defraud the revenue of the United States."

Appellants first charged that the defendant aircraft had not been found at a place where it could be examined by customs officials because the government had failed to demonstrate with reasonable certainty that the defendant aircraft had crossed the territorial boundaries of the United States. The government, in turn, argued that the customs service had plenary power to examine aircraft at the functional equivalent of a border and that the government had, in fact, proved that the defendant aircraft had been involved in a border crossing.

■ This court is mindful of legal precedent that teaches that the existence of a border crossing or its "functional equivalent" is a question of fact. *United States v. Helms*, 703 F.2d 759, 763 (4th Cir.1983). Accordingly, the district court's finding that the defendant aircraft was involved in a border crossing can be reversed only if it is clearly erroneous.

■ Customs officials have authority to conduct a border-type search of an aircraft when they are reasonably certain that the object of the search has entered from a foreign country. *United States v. Ivey*, 546 F.2d 139, 142 (5th Cir.1977), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977). To satisfy the required degree of certitude, "it is not necessary that the vehicle, aircraft, or vessel have been under 'actual observation' from outside United States Territory until its arrival and search." Rather, customs agents are entitled to "draw reasonable inferences from circumstances and base their actions on common sense judgments." *Id.*

■ Appellants argued that the government had failed to demonstrate with reasonable certainty that the defendant aircraft was the same Beechcraft Baron that had crossed the border while operating without navigation lights. Appellants charged that the customs officials could not have reasonably identified the seized Beechcraft Baron as the unidentified aircraft that had violated the United States air space since the aircraft that they had been tracking on radar evaded their surveillance and disappeared over Sparta, Tennessee, and for the additional reason that there was a one-hour time lapse between the disappearance of the monitored Beechcraft Baron and the discovery of the abandoned defendant Beechcraft Baron at the Rockwood Airport.

In *United States v. Niver*, 689 F.2d 520 (5th Cir.1982), the Fifth Circuit considered the degree of reasonable certitude required to support the identification of a border-crossing aircraft under circumstances where the violating aircraft was lost by the pursuing radar tracking aircraft for periods exceeding twenty minutes on each of numerous occasions. Prior to landing, the pilot of the aircraft that was under surveillance had misstated the aircraft's call numbers, and it was determined upon landing that the aircraft's identification numbers had been altered and falsified. The court concluded that from the erratic and suspicious flight pattern of the unidentified craft from its point of interception to its ultimate location of discovery, it was reasonably certain that the seized aircraft was the same aircraft that had been tracked by the government agents.

Similarly, in the case at bar, the totality of the circumstances attendant to the flight of the unidentified Beechcraft Baron, including the aircraft's suspicious flight maneuvers and flight pattern from its original point of detection, throughout its continued uninterrupted surveillance from the time it penetrated the territorial boundaries of the United States to the time it disappeared into the cloud bank over the Sparta Tennes-

see Airport, coupled with the condition, appearance and location of the Beechcraft Baron that had been discovered at the Rockwood, Tennessee Airport, reflected a scenario that in all respects matched the Bureau of Customs' drug smuggling flight profile. Considering that the unidentified Beechcraft Baron was initially intercepted over the westerly section of Grand Bahama Island after having apparently arrived in that area from a point of departure south of Nassau; that it was on a heading calculated to penetrate the territorial airspace over the Florida coastline; that it had filed no flight plan; that it failed to notify the United States Air Defense Identification Zone of its identity or approach; that it failed to notify the United States Bureau of Customs of its intended entry in the United States; that it was operating without navigation lights; that it was assiduously avoiding radio communications of any kind including position reports both before and after its entry into the territorial airspace of the United States; that it was flying at an altitude of 100' to avoid coastal radar detection for approximately sixty-miles before crossing the United States border at or near Vero Beach, Florida; that it was initially intercepted along an air corridor commonly followed by drug smugglers to illegally transport drugs into the United States from Caribbean Islands and other distribution centers in the western hemisphere; that the aircraft discovered at the Rockwood Airport had obviously landed after nightfall when it was closed to air traffic and was unattended; that Rockwood Airport was a one airstrip field situated in a relatively remote geographical area of Tennessee; that the Beechcraft Baron was found abandoned in the center of the single landing strip on the airfield with a flat tire; that its co-pilot's seat had been removed and its fuel system modified by a portable auxiliary fuel system complete with newly installed fuel lines and an auxiliary fuel transfer valve configured to accept the connection of a rubber bladder tank that had not been certified or approved by the FAA; that the modified fuel system was designed to substantially increase the aircraft's fuel load to extend its normal flight time of 4 to 4½ hours and its range of flight; that it had been continuously airborne from approximately 8:00 p.m. on December 18, when first intercepted until approximately 2:00 a.m. on December 19 when it disappeared into a cloud bank over Sparta, Tennessee, a period of some 6½ hours without refueling, discounting any additional airborne time that accrued before intercept over Grand Bahama Island and after disappearance over Sparta, Tennessee and its ultimate landing site some 100 miles away at Rockwood Airport; that the gasoline saturated tarmac under and immediately around the abandoned Beechcraft indicated recently dumped excess fuel; that Rogers, a suspected drug smuggler, had been arrested in a motor vehicle reported stolen earlier that morning from Rockwood Airport between 3:00 and 6:00 a.m. in Morgan County carrying approximately $1,900.00 in cash and the ignition keys to the seized Beechcraft Baron in his person, it was reasonable to conclude with certainty that the Beechcraft Baron aircraft initially intercepted by customs agents over the Grand Bahama Island and thereafter tracked to Sparta, Tennessee, was the same Beechcraft Baron aircraft seized at the Rockwood Airport, Tennessee.

■ Mindful of the fact that the case at bar arose under 19 U.S.C. § 1703, this court finds that the Beechcraft Baron forfeited herein had been involved in an illegal border crossing from a foreign country upon entering the territorial airspace of the United States in the approximate vicinity of Vero Beach, Florida and was therefore subject to a border type search; that it had been operating without navigation or other lights; and that its fuel system had been modified for the purpose of smuggling merchandise into the United States to defraud the revenue of the United States, this court concludes that the trial court was correct in finding a nexus between the defendant aircraft and the criminal activity proscribed by the statute. Accordingly, the judgment of the trial court is AFFIRMED.